# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00042-CV

---

**R. G., J. C., and C. M., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-FM-21-000350, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

Appellants R.G. (Father), J.C. (Mother), and C.M. (Grandmother) each appeal from the district court's order, following a bench trial, terminating Father's and Mother's parental rights to their twin children, two-year-old S.C. (Sally) and M.C. (Molly), and appointing the Texas Department of Family and Protective Services (the Department) as the sole managing conservator of the children.[1]  In two issues on appeal, Father and Mother each challenge the district court's findings that (1) termination of their parental rights and (2) appointment of the Department as sole managing conservator was in the best interest of the children.  Grandmother, who is proceeding pro se (as she did in the court below), also challenges the district court's appointment of the Department as sole managing conservator.  We will affirm the district court's termination decree.

---

[1] For the children's privacy, we refer to them using pseudonyms and to their parents and other relatives by their familial relationships to each other, and we refer to the children's approximate age when trial concluded.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

BACKGROUND

The case began shortly after the twins were born, when the Department received a referral alleging that Mother and one of the twins had tested positive for amphetamines when the twins were born, the meconium of both twins had tested positive for methamphetamines, and Mother had tested positive for methamphetamines during her pregnancy. The Department's removal affidavit, a copy of which was admitted into evidence, averred that Mother reported that her "drug of choice" was marijuana but that she "sometimes" uses methamphetamine, including as recently as one month before the twins were born.

During the subsequent Department investigation, Mother reported that she currently lived with a friend but did not know the friend's address. Mother also reported that she had been involved with the Department in the past, that her two older children had been adopted by Grandmother, and that she wanted the twins to be placed with Grandmother while the case was ongoing. The Department contacted Grandmother, who confirmed that she had adopted Mother's older children and expressed interest in the twins staying with her while Mother "get[s] the help she needs." The twins were placed with Grandmother following a home assessment and interview.

Approximately one year after the case began, Father was adjudicated the twins' father, following DNA testing that established his paternity, and thereafter he was made a party to the suit. Both Father and Mother were ordered to complete various services during the case, including random drug testing. Neither parent was successful in completing services. Father tested positive for cocaine in April 2022 and did not communicate with the Department for several months after that. Mother failed to maintain consistent communication with the Department or submit to most of the Department's requested drug tests but, in February 2022,

tested positive for THC, methamphetamines, and opiates upon giving birth to another child. That child tested positive for methamphetamines and opiates in his urine and THC, amphetamines, methamphetamines, and opiates in his meconium.

This case proceeded to a four-day bench trial, at the conclusion of which the district court took the matter under advisement. The district court later issued a decree of termination, having found by clear and convincing evidence that termination of Father's and Mother's parental rights was in the best interest of the children and that Father and Mother had: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; (3) constructively abandoned the children; and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O), (2). The district court additionally found that Mother had used a controlled substance in a manner that endangered the health or safety of the children and that Mother had been the cause of the children being born positive for a controlled substance. *See id*. § 161.001(b)(1)(P), (R). Regarding conservatorship, the district court found that it would be in the best interest of the children to appoint the Department as the nonparent sole managing conservator of the children. Finally, the district court ordered that Grandmother, who had intervened in the suit shortly before trial, "shall be entitled to have a relationship with the children until they are adopted, if they are adopted" and that she "shall be allowed to continue to have regularly scheduled visits with the children as determined by further order of the court at regularly scheduled review hearings." This appeal followed.

3

**DISCUSSION**

**Termination of parental rights**

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the children's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). In this appeal, Father and Mother do not challenge the evidence supporting the statutory grounds for termination of their parental rights. Instead, they each argue that the evidence is legally and factually insufficient to support the district court's finding that termination of their parental rights was in the best interest of the children.

*Standard of review*

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it."

4

*Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

However, "an appellate court's review must not be so rigorous that the only fact-findings that could withstand review are those established beyond a reasonable doubt."

5

*In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

### Best-interest considerations

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

6

*Evidence presented*

Evidence regarding Father and Mother

Father had a history of committing domestic violence against Mother. A victim-services counselor for the family-violence unit of the Austin Police Department (APD) testified about an incident that occurred in January 2019, in which Mother reported that Father had assaulted and strangled her. According to the counselor, the assault resulted in "bruising and leaking under [Mother's] eye and a cut on her lip." An APD officer who responded to the assault provided similar testimony regarding Mother's injuries and provided more detailed testimony regarding the strangulation, explaining that Father had "wrap[ped] his right arm around [Mother's] neck with her neck like in the crook of [Father's] elbow," "dragged her back to the "bed, threw her on to her back on the bed and then climbed on top of her and then used both of his open hands and placed them around [Mother's] neck and began to choke her" until Mother told Father that she could not breathe and that her "vision started to go dizzy and she said she was starting to see spots in her vision."

Another APD officer testified about an incident that occurred in October 2020, while Mother was pregnant with the children. The officer responded to a domestic disturbance in which Father had punched Mother in the back of her head with his fist when she was trying to leave their apartment following an argument, causing Mother intense pain and resulting in her being transported to a hospital. Father claimed that during this incident, Mother had punched him in his groin. A third APD officer testified about another domestic disturbance between Mother and Father in February 2022 that did not result in physical violence but involved them "screaming at each other" inside a car.

Mother also had a criminal history, including convictions for assault, arrests for drug possession, and an arrest for burglary of a building that occurred while the case was ongoing. An APD officer testified that in February 2022, he responded to a "burglary hot shot," i.e., a "burglary in progress with suspects actively breaking into a residence." A white truck had reportedly fled the scene following the burglary, and when the officer stopped the truck, he found Mother inside the vehicle in the front passenger seat. Narcotics, including methamphetamine, were found in a purse inside the vehicle, along with drug paraphernalia and other possible contraband, and Mother admitted to the officer that she used methamphetamine. Another APD officer testified about a separate incident during which a security camera recorded a male and a female, later identified as Father and Mother, entering a vacant apartment. The officer testified that based on this incident, arrest warrants for burglary of a building were issued for Father and Mother and that the warrants had been issued that day, i.e., the day on which the officer testified at the termination trial. The affidavits for the arrest warrants, copies of which were admitted into evidence, reveal that the offense was committed in June 2022 and that in the security video, Father could be seen stealing a washer and dryer from the apartment, with Mother present at the apartment when the theft occurred.

Father and Mother had each been ordered to engage in services to obtain the return of their children. A Department supervisor testified that Father completed a psychological evaluation but did not follow the recommendations provided, did not complete individual counseling, failed to complete a batterers intervention and prevention program (BIPP), and had not completed SAFE Fatherhood classes. Father also tested positive for cocaine in April 2022.

The supervisor testified that Mother completed a psychological evaluation but failed to follow the psychologist's recommendations for treatment, completed some but not all of

8

her parenting classes, failed to complete a drug and alcohol assessment, and failed to participate in drug testing or treatment. The supervisor also testified that Mother did not participate in a domestic-violence class, although Mother testified that she completed the class but was unable to download and print the certificate of completion. When asked why she had not engaged in services earlier in the case, Mother testified that she "really just didn't take [the case] . . . too seriously" while the children lived with Grandmother.

Father and Mother each had supervised visits with the children. At the beginning of the case, Mother visited the children regularly at Grandmother's house and, while she was there, did the laundry, helped prepare bottles for the children, changed their diapers, and put the children to sleep. However, Grandmother also testified that Mother "expected everything" from her and would sometimes "take advantage" of Grandmother by not paying attention to the children while she was there.

Additionally, Grandmother testified about an incident that occurred during a visit in May 2022 when Mother assaulted Grandmother's sister. According to Grandmother, Mother and Grandmother's sister got into a "fist fight" during which the two were wrestling on the ground, "punching and pulling hair," and Mother "kept punching her and punching her and punching her" until the sister "got her in a chokehold." The assault occurred in the presence of the children, and Grandmother had to take Sally to a neighbor's house because Sally was scared, screaming, and crying in response to the fight. Grandmother believed that Mother might have been under the influence of drugs at the time. After that incident, Grandmother requested that visits take place at the Department office, and the trial court subsequently ordered Mother to "remain 200 yards away from any place that she expects the Children, or learns the Children, to be, including their residence and daycare or school, except for court-ordered visitation." The

9

trial court also ordered Father to "not cause or allow Respondent Mother [] to violate this order." In violation of that order, Father and Mother attempted to visit the children at Grandmother's house in June 2022, and Grandmother had to call the police to get them to leave. After that, Mother's contact with Grandmother became inconsistent. Mother testified that she had not visited the children since the Department began supervising visitation, and that it had been "months" since she had last seen the children. When asked why she had not visited them, Mother testified that it was because of her "separation anxiety."

Father visited the children three times in March 2022 but did not visit them thereafter. Father testified that he loved the children and wanted to see them but that "the stress of services . . . started to overwhelm [him] a little bit and then got in the way of [his] visits." Father testified that if the children were returned to him, his mother and younger brother, who lived with Father, could assist him in caring for the children, although the Department supervisor testified that both relatives had extensive criminal histories. Father testified that he wanted the children to be placed with him but acknowledged that the trial court might not see him as a fit parent "right now." He asked that the children be placed with "somebody who can care and provide for them, like, all the way," which Father believed to be Grandmother.

Mother similarly testified that she wanted the children returned to her but that "the next best place for [her] children would be with [Grandmother]." Mother acknowledged that she had not secured stable housing by the time of trial but had "just applied for some housing" with a housing program and was on a waiting list. Mother "hoped" that she would have housing "within a matter of weeks or months." Mother also testified that she had just started a job at a printing company, where she scanned, uploaded, and reprinted documents.

10

However, Mother added that the company was "slow on work right now," and she worked only three- or four-hour shifts per day.

The Department supervisor testified that the Department believed termination of Father's and Mother's parental rights was in the best interest of the children. She explained,

> [Mother] and [Father] have not shown any significant change in their behavior. In fact, it appears as if they're still engaging in criminal activity. They have a history of family violence. They have a history of substance use. Neither has tested a long enough time to show continued sobriety, and it would be in the best interest of [Sally] and [Molly] to be in a home, like I said, that's drug free, violence free, stable, and safe.

Evidence regarding plans and proposed placements

The Department supervisor testified that the Department's original plan for the children when the case began was family reunification. However, that plan changed to relative adoption in 2022 after Mother gave birth to a new child (Brother) who tested positive for drugs at birth and Father tested positive for cocaine. When Brother was born in February 2022, Grandmother was considered as a placement, but "because she had the older two boys and [Sally] and [Molly], she declined." Instead, Brother was placed with a foster family. At the time of trial in Fall 2022, Father and Mother wanted the twins either returned to them or placed with Grandmother. The Department's plan, according to the Department supervisor, was for the Department "to take permanent managing conservatorship of the girls and hopefully have them adopted" by the foster family where Brother had been placed.

The children had been placed with Grandmother and her husband since the case began, days after the children were born, and Grandmother had already adopted Mother's two older sons, who were twelve and seven years old at the time of trial. At the time of placement,

11

the Department provided resources to Grandmother to help her care for the children, including "pack and plays, car seats, some formula, diapers, wipes, some basic necessities." The Department supervisor testified that they did "all the necessary background and CPS checks, the criminal history and the CPS checks" and then "move[d] forward with a home study" on Grandmother that the Department approved. Thus, at the beginning of the case, the Department believed Grandmother to be a safe placement.

However, the Department supervisor testified that Grandmother's home was approved "for placement purposes only" and not for adoption because of financial concerns that were raised during the home study and later during the case. The supervisor testified that Grandmother and her husband were not "making enough money to cover all their rent and all the bills." Additionally, the Department was concerned about the children's sleeping arrangements, as they were sleeping on the floor on a mattress rather than on beds. In November 2021, Grandmother reached out to the Department and told them that they were "very, very, very behind in rent" in the amount of $9,000 and had received an eviction notice from their landlord. They were also behind in their utility bills in the amount of $5,000. In response to Grandmother's request for financial assistance, the Department provided the family with $5,000, beds for the children, gift cards, car seats, and a Thanksgiving turkey. The Department offered to pay for daycare for the children so that Grandmother could obtain employment. Grandmother "was also receiving kinship funds from the approved home study, and it got to a point where there was not much more [the Department] could offer." Even with the Department's assistance, Grandmother was "still financially having trouble staying . . . on top of everything." The Department also expressed concerns about a roach infestation inside the home and a front-door lock that was "not as sturdy as it should have been."

12

On Friday, July 22, 2022, the Department removed the children from Grandmother's home to visit the foster family for the weekend. The purpose of this visit, according to the Department supervisor, was to allow Grandmother some time to "work on getting the financials together, getting the roaches taken care of, fix[ing] the door, and look[ing] for a daycare for the girls." The Department caseworker who picked up the girls from Grandmother's home testified that they "were a little dirty" and that "[t]heir hair was matted." The caseworker transported the girls to the Georgetown CPS office, where the foster family was waiting to take them to their home.

The foster mother, D.A. (Foster Mother) testified that she had worked as a nurse for 19 years, including as a pediatric office nurse for several years. Currently, Foster Mother worked as "a director of a small nonprofit" organization that operated three months out of the year and as "a stay-at-home mom" for the other nine months of the year. She and her husband had been married for over 20 years.

Foster Mother testified that she had communicated with Grandmother "a couple times a week on average" after Brother was placed in her care and had "invited her out to the house" on multiple occasions. Most of the time, Grandmother could not visit the foster family because of transportation issues, but on one occasion, Grandmother "brought the twins and came out to [their] home to visit and meet baby [Brother]." Foster Mother testified that she was aware of Grandmother's financial difficulties and had sent her gift cards "during times when they were struggling."

Foster Mother testified that when the children were brought to her for the weekend visit, she "had a long list of concerns, including the condition they were in." The children "were very dirty," and Molly "had an untreated rash all over her body" and a black eye.

13

Immediately upon receiving the children, Foster Mother took photos of the black eye "so that no one would think it happened in our care." Copies of these photos were admitted into evidence. Foster Mother also observed that the children did not use words to communicate but only cried and screamed and that they were "constantly touching themselves and had their hands in their pants," which indicated to her that the children's skin was irritated and itchy. Additionally, the children had "fissures," i.e., open sores, under their toes and "severe labial adhesions" that Foster Mother discovered when she was changing their diapers. Foster Mother explained that when "you're changing a little girl, you have to spread the skin to clean everything out, and unfortunately you couldn't spread the skin" because "the labia [were] completely fused together." Foster Mother contacted the Department "first thing Monday morning" about her concerns and arranged for them to see a pediatrician.

On Tuesday, the Department removed the children from Grandmother's care and placed them with the foster family. A Department investigator testified that the change in placement was prompted by an intake alleging physical abuse to Molly based on her having a black eye and other facial bruising and further alleging medical neglect to both girls based on the labial adhesions. The investigator also testified that the Department had concerns related to the children's development: "They were unable to feed themselves, and they were at an age where they should have been able to do that, and they were using the wrong tools . . . like baby bottles and things like that." The investigator explained that at the time of trial, Grandmother "cannot be a placement for the girls" because the Department had "an open investigation regarding her household" and "ongoing concerns with medical neglect." The investigator's supervisor testified that the Department had "reason to believe" that physical abuse had occurred while they were in Grandmother's care "based on [Molly] having bruises to her face."

14

The Department caseworker who had brought the children to the foster family testified that when she later visited them in the foster home, they had been clean and dressed appropriately. Also, the children's toe fissures "were pretty much all healed up," the labial adhesions were "almost cleared up as well," and the children were able to say words. The caseworker further testified that Grandmother had not acknowledged that the children had medical issues, speech issues, and developmental delays and had not requested to attend any of the children's medical appointments or requested to see the children's medical records. Another caseworker testified that Grandmother told her that the labial adhesions might have been the result of eczema, allergies, or diaper rashes; that the black eye was caused by Molly "running from the couch and like falling off the couch area and then . . . bump[ing] her eye"; and that the children's rashes might have been caused by bug bites from playing outside. Grandmother also told the caseworker that the children were "singing and speaking and interacting well" before they were removed from her care and attributed any communication delays to the disruption caused by their removal from her care.

Foster Mother testified that she had "multiple different therapies . . . lined up" for the children, including physical therapy, speech therapy, and possibly occupational therapy. Currently, Foster Mother had the children seeing an Early Child Intervention (ECI) special skills trainer who was teaching them verbal communication and sign language. Foster Mother also testified that she spent a minimum of two hours per day with the children "catching up their developmental delays as well as their communication, their sign language, et cetera." She further testified that the children's labial adhesions "had completely opened up," that their rashes had cleared up, and that the children had no diaper rashes or urinary tract infections while they were in her care.

15

Foster Mother further testified that since the children had been placed in her care, she had "a great relationship" with them and that they call her "mama." Whenever she picked them up from daycare, "they come running with their hands up happy and smiling and giggling." She added, "We're a family." Foster Mother testified that it was her "hope and goal" to adopt the children, although she acknowledged that she had concerns about the adoption because one of the girls had exhibited "some aggressive behavior towards [Brother], and his safety came into question." The foster family was attempting to work through this issue and was "taking it one day at a time."

Grandmother, in her testimony, denied abusing or neglecting the girls but acknowledged that she could have done "a better job" caring for them and promised to do better moving forward if they were returned to her. Grandmother acknowledged that at the time of trial, she was still struggling financially and that she and her husband were planning on moving because the landlord would soon raise their rent. Grandmother also testified that her priority was "the girls and their safety" and that if they were returned to her, she would not allow Father and Mother to see the girls until "they get their lives right."

Evidence regarding the children

The ECI specialist who had been working with the children to improve their communication testified that when she first met with them in September 2022, neither child used words to communicate, even though at their age, they should have been able to use 20 to 25 words. Molly "wasn't making the sounds towards . . . people" and "would just come up to people and tap them to get their attention," while Sally "was just babbling and making sounds" when playing by herself, "but she wasn't doing it to approach somebody." The specialist also worked with the children "on fine motor skills, self-feeding skills, and cognitive skills." They

16

were feeding themselves with their fingers, had difficulty with attention and memory tasks such as identifying animals in picture books, and lacked fine motor skills such as using a spoon. Although the children had improved their functioning since meeting with her, the specialist testified that they would continue to need therapy moving forward.

Another ECI specialist who evaluated the children testified that Molly "was delayed nine months in development at a 47 percent delay," "12 months delayed at a 63 percent delay" in receptive communication, and "16 months delayed and an 84 percent delay" in expressive communication. Molly also had a 21 percent delay in gross motor skills and a 10 percent delay in cognitive function. Sally had similar delays. Dr. Neha Patel, a pediatrician who had evaluated Molly, testified that at 22 months old, she was at a developmental age of approximately 12 to 14 months.

When the children were first brought into her care, Foster Mother had them evaluated by Dr. Lynn Azuma, a pediatrician. Dr. Azuma testified that she examined both children and observed that they had rashes, toe fissures, and labial adhesions as Foster Mother had suspected. Azuma also observed during her initial evaluation that Molly had a bruise on her right cheek. The labial adhesions were "moderate to severe," and Azuma testified that their cause was unknown, although possibilities included low estrogen, trauma, an infection, or dirty diapers and poor hygiene. Azuma testified that she provided Foster Mother with medications and treatment instructions for the children's rashes, fissures, and adhesions and that "everything improved" following treatment.

A nurse practitioner who had reviewed the children's medical records prior to trial testified that she reviewed photographs of the bruising to Molly and determined that "the bruising was on two planes of the body, both on the front under actually the right eye, and then

17

along the side of the face around the right eye." She testified that the bruising was not consistent with Grandmother's claim that Molly fell and hit a table. The nurse practitioner opined that the bruising was "concerning for physical abuse." Regarding the adhesions, the nurse practitioner did not determine that they were caused by neglect. However, she added, "[T]he only thing that's a little bit concerning and not necessarily neglectful is that a reasonable adult should have noted that there were adhesions and the girls should have been brought in for a medical evaluation for that." She believed that "it would be apparent that the labia was fused" to an adult who was "doing good hygiene and good cleaning."

*Analysis*

In arguing that the evidence is insufficient to support the finding that termination of their parental rights is in the children's best interest, Father and Mother focus almost exclusively on favorable evidence regarding their proposed placement, Grandmother, including evidence showing that the children were bonded to her, that she loved the children, that she had raised them for more than half their lives, that she had adopted their older brothers, and that she had received positive reports from the Department until the children's visit with the foster family in July 2022. Father and Mother also point out that the Department's plan for the children, adoption by the foster family, was uncertain at the time of trial.[2]

---

[2] We note that a supplemental clerk's record was filed with this Court that included a docket-sheet entry indicating that at a post-trial permanency hearing, the attorney ad litem for the children requested that the Department assist with finding "another placement that would be willing to adopt the girls." However, our review is limited to the evidence that was before the district court at the time of its ruling. *See D.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00777-CV, 2023 WL 3102616, at *9 n.6 (Tex. App.—Austin Apr. 27, 2023, pet. denied) (mem. op.).

18

Although the above constitutes some evidence that is contrary to the finding that termination of Father's and Mother's parental rights is in the children's best interest, ample evidence in the record nevertheless establishes that termination of their parental rights was in the best interest of the children. This includes evidence showing that: (1) Mother was never the children's primary caregiver, and although she visited them regularly at the beginning of the case, she had stopped visiting the children once the Department began supervising the visitations, and it had been "months" since she had last seen the children; (2) Father had never been the children's caregiver and had visited them on only three occasions; (3) Father and Mother had a history of violent behavior, including multiple assaults that Father had committed against Mother (including one assault that occurred while Mother was pregnant with the children) and an assault that Mother had committed against Grandmother's sister in the presence of the children; (4) Father and Mother had a history of substance abuse, and both tested positive for illegal drugs while the case was ongoing, with Mother giving birth to another child who tested positive for drugs at birth; (5) Father and Mother continued to engage in criminal activity while the case was ongoing, including a burglary offense for which warrants for their arrest were issued during trial; (6) Father and Mother failed to complete their court-ordered services, including services that were designed to address their ongoing issues with substance abuse and domestic violence; (6) Mother did not have a stable home or consistent employment at the time of trial; (7) Father lived with family members who the Department determined had extensive criminal histories and were ineligible as placement options; (8) on one occasion, Father and Mother had attempted to visit the children at Grandmother's home in violation of a court order that prohibited them from doing so; and (9) despite the evidence that adoption by the foster

family was uncertain, there was considerable evidence presented that the children's health and development had improved while in the care of the foster family.

Viewing the above evidence in the light most favorable to the finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Father's and Mother's parental rights was in the best interest of the children. Therefore, the evidence is legally sufficient to support the best-interest finding. Moreover, considering the entire record, we cannot conclude that the evidence contrary to the finding is "so significant" that the factfinder could not have formed a firm belief or conviction that termination of Father's and Mother's parental rights was in the best interest of the children. Accordingly, the evidence is also factually sufficient to support the best-interest finding.

We overrule Father's and Mother's first issue.

**Conservatorship**

In Father's and Mother's second issue and in Grandmother's sole issue, they assert that the district court abused its discretion in appointing the Department as Permanent Managing Conservator of the children. In their view, Grandmother should have been appointed managing conservator of the children.

As an initial matter, because Father's and Mother's parental rights have been terminated, and we are affirming that portion of the district court's order terminating their parental rights, Father and Mother lack standing to challenge the district court's conservatorship decision. *See* Tex. Fam. Code § 161.206(b); *In re H.M.M.*, 230 S.W.3d 204, 204-05 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see also In re N.E.*, No. 01-22-00739-CV, 2023 WL 2530197, at *12 (Tex. App.—Houston [1st Dist.] Mar. 16, 2023, pet. denied)

(mem. op.); *A.K. v. Texas Dep't of Fam. and Protective Servs.*, No. 03-22-00285-CV, 2022 WL 14989625, at *10 (Tex. App.—Austin Oct. 27, 2022, pet. denied) (mem. op.). Accordingly, only Grandmother's challenge to that decision is properly before us.

Having terminated both Father's and Mother's parental rights, the trial court was required to appoint either the Department or another permissible adult or agency as managing conservator. *See* Tex. Fam. Code § 161.207(a); *In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Conservatorship determinations "are subject to review only for abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Legal and factual sufficiency are not independent grounds of error under this standard but are factors used to determine whether the trial court abused its discretion. *In re K.S.*, 492 S.W.3d 419, 426 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Under this standard, an appellate court considers whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion. *Zeifman*, 212 S.W.3d at 588. The findings necessary to support the trial court's conservatorship decisions need be supported by only a preponderance of the evidence, rather than clear and convincing evidence. *See* Tex. Fam. Code § 105.005; *J.A.J.*, 243 S.W.3d at 616. A trial court does not abuse its discretion so long as there is some substantive, probative evidence to support its decision. *Zeifman*, 212 S.W.3d at 587.

Here, the district court explained its conservatorship decision in a letter sent to the parties before it issued its decree. The court wrote:

The evidence clearly demonstrated a significant bond between [Grandmother] and

21

the children. That they love each other and care for one another is certainly not in doubt. I do not find that [Grandmother] abused or neglected the children. However, the evidence also very clearly demonstrated some significant developmental delays in each child, which were apparent while the children were in her care but went undetected and untreated. The proven facts demonstrate the benefit of diagnosis and treatment of their physical, emotional, and developmental delays and the progress the children have made since their removal from the family. Treatment is ongoing and continues to be necessary to ensure that the children will overcome the identified deficits. In the final analysis, I find that it is the best interest of the children to deny the relief requested by the Intervenor and grant the petition by the Department of Family and Protective Services to be named the Permanent Managing Conservator of the children.

"Some substantive, probative evidence" supports the district court's decision. As summarized above, medical professionals testified that the children had medical issues when they were removed from Grandmother's care and that their development and physical health improved after the children received diagnosis and treatment. When the children's medical issues were brought to Grandmother's attention, she either denied that the issues existed or attempted to minimize their severity. She also did not notice the children's labial adhesions, which a pediatrician testified were "moderate to severe" and a nurse practitioner testified should have been apparent to an adult who was "doing good hygiene and good cleaning" of the children. Although Grandmother promised to do a better job caring for the children if they were returned to her, the district court could have reasonably inferred that moving forward, the Department would be better able to address the children's ongoing special needs. Moreover, the district court could have reasonably concluded that appointment of the Department as permanent managing conservator would allow the foster family or some other family the opportunity to adopt the children, which would provide the children with permanence and stability. On this record, we cannot conclude that the district court's decision to appoint the Department as permanent managing conservator of the children was arbitrary or unreasonable.

22

We overrule Father's and Mother's second issue and Grandmother's sole issue.

## CONCLUSION

We affirm the district court's termination decree.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Baker and Triana

Affirmed

Filed:   June 29, 2023